# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

CONROY J. HAYES,

        Petitioner,

   v.

DERREL G. ADAMS,

        Respondent.

_____/

1:09-CV-01749 LJO GSA HC

FINDINGS AND RECOMMENDATION
REGARDING PETITION FOR WRIT OF
HABEAS CORPUS

     Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## BACKGROUND

     Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Kern, following his conviction by jury trial on April 18, 2006, of murder in the first degree (Cal. Penal Code § 187), and possession for sale of cocaine base (Cal. Health & Saf. Code § 11351.5).  (CT[1] 550-551.)  Weapon enhancements were also determined to be true.  (CT 550-551.)  In a bench trial in a bifurcated proceeding, the trial judge determined that Petitioner had served two prior prison terms within the meaning of 667.5(b). (CT 568-569.)  On May 17, 2006, Petitioner was sentenced to serve an aggregate indeterminate term of sixty-four years to life in state prison. (CT 609-612.)

---

[1]"CT" refers to the Clerk's Transcript on Appeal.

1      Petitioner filed a timely notice of appeal.  On May 9, 2007, the California Court of

2 Appeal, Fifth Appellate District ("Fifth DCA"), affirmed Petitioner's judgment in a reasoned

3 decision, but dismissed two prior prison term enhancements. (See Lodged Doc. No. 7.)

4 Petitioner petitioned for rehearing but rehearing was denied. (See Lodged Doc. Nos. 8 and 9.)

5 On July 11, 2007, Petitioner filed a petition for review in the California Supreme Court.

6 (See Lodged Doc. No. 15.)  Review was granted but briefing was deferred.  On September 12,

7 2007, the petition was dismissed and the case was remanded to the Fifth DCA in light of People

8 v. Black, 41 Cal.4th 799 (2007).  (See Lodged Doc. No. 16.)

9      Petitioner also sought collateral relief in the state courts.  On March 10, 2008, he filed a

10 petition for writ of habeas corpus in the Kern County Superior Court.  (See Lodged Doc. No. 13.)

11 On May 20, 2008, the petition was denied.  (See Lodged Doc. No. 14.)  On June 20, 2008, he

12 filed a petition for writ of habeas corpus in the Fifth DCA.  (See Lodged Doc. No. 10.)  On

13 September 4, 2008, the petition was denied and Petitioner was instructed to seek relief in the

14 superior court first. (See Lodged Doc. No. 12.)  Petitioner then filed a petition for writ of habeas

15 corpus in the California Supreme Court on September 22, 2008.  (See Lodged Doc. No. 17.)  The

16 petition was denied on April 22, 2009.   (See Lodged Doc. No. 18.)

17      On October 5, 2009, Petitioner filed the instant federal habeas petition, presenting nine

18 claims for relief.  On January 19, 2010, Respondent filed an answer to the petition.  On March 1,

19 2010, Petitioner filed a traverse.

20 **STATEMENT OF FACTS[2]**

21      Rochelle M., the homicide victim, lived in an apartment with her 10-year old
daughter, T., and her cousin Avanae Eddington. Defendant moved into Rochelle's

22 apartment several weeks before she was murdered. Rochelle would cook, clean, iron, and
wash defendant's car for him, even though defendant was not employed. Rochelle also

23 gave defendant money and bought him a white Cadillac.

24      Eddington testified that defendant would argue with Rochelle and would beat her.
On two occasions defendant pulled a gun on Rochelle. On four occasions, Eddington

25 intervened when defendant was beating Rochelle. Defendant had many other girlfriends,
and Rochelle and defendant would argue about that. Defendant would lock Rochelle out

26

27    [2]The Fifth DCA's summary of the facts in its May 9, 2007, opinion is presumed correct. 28 U.S.C.

28 §§ 2254(d)(2), (e)(1).  Petitioner does not present clear and convincing evidence to the contrary; thus, the Court
adopts the factual recitations set forth by the Fifth DCA.

of their bedroom and would talk on his cellular phone to his other girlfriends. There were occasions when defendant and Rochelle would argue and Rochelle would leave the apartment by jumping out the window in T. and Eddington's room.

According to Eddington, defendant's gun was a .38 revolver. Out of fear, Rochelle asked Eddington to remove the bullets from the gun, but Eddington did not know how. Rochelle also asked her cousin to remove the bullets, but he did not know how either.

Defendant threatened to kill Rochelle many times. Rochelle would often telephone defendant at all hours of the night to find him. He would hang up on her and she would get mad.

In addition to testifying about Rochelle and defendant's abusive relationship, Eddington testified concerning drug sales that occurred in the apartment. She said that people would knock on the apartment door and defendant would tell Rochelle to go get a particular amount of drugs. She would do so and he would sell it to the person at the door. Eddington had seen defendant chop up crack cocaine in the apartment. Defendant had a plate, razor blades and bags to put the drugs in. He prepared the drugs in the room he shared with Rochelle and kept them in one of Rochelle's drawers in that room.

Rochelle was pregnant. Defendant told her she "better have" an abortion because he did not want a baby by her. Rochelle was upset. Two days before she was murdered, Rochelle told defendant to leave.

T. testified that defendant lived with them for several weeks. Defendant failed to help around the house. He treated T.'s mother, Rochelle, poorly. T. saw defendant hit Rochelle on at least 10 occasions. He would hit her with his hand and his fist.

Rochelle would sometimes escape through the window in T.'s room when defendant was hitting her. Rochelle would go to her neighbor's apartment after she fled.

T. said that during one argument between defendant and Rochelle, defendant put bleach in the fish tank water and killed T.'s fish. On another occasion when defendant was fighting with Rochelle, T. grabbed a knife and told defendant not to put a hand on her mother. Defendant told her that if she did not put the knife down he would shoot Rochelle. T. put the knife down.

T. had seen defendant point a gun at Rochelle during arguments. He had a gun in a black bag that he kept in his car. Rochelle tried to hide the gun one time. Defendant had kicked in the bathroom door and the bedroom door on separate occasions when he was fighting with Rochelle.

Rochelle sent T. to her aunt's to stay for a few days, several days before Rochelle was murdered.

On the evening of July 10, 2005 (the night before the murder), Eddington was at home from about 4 p.m. to midnight. Defendant was there for a short time around 8 p.m. T. was staying at her aunt's house. When Eddington left, Rochelle was asleep in her room.

Defendant drove the white Cadillac and a maroon Monte Carlo. Defendant and Rochelle typically parked their cars behind their apartment in an alley. In the early morning hours of July 11, 2005, surveillance cameras at a store on the alley where Rochelle's apartment was located captured pictures of a white Cadillac and a maroon Monte Carlo traveling in the alley. The Cadillac was pictured driving south toward the apartments at 3:42 a.m. The Monte Carlo was then pictured driving north in the alley one

3

minute later. The Monte Carlo was again captured on film driving south in the alley at 4:14 a.m.[FN1] From 3 a.m. to 5 a.m. there was no other traffic, foot or vehicle, captured on the camera videotaping the alley.

> FN1. The clock on the video monitor was 10 minutes fast; the times listed above are the corrected times taking into account the 10-minute time difference.

At 4:47 a.m., defendant telephoned 911 requesting an ambulance. The call lasted several minutes. After making his request, defendant could be heard in the background yelling at someone to get up. During part of the call, his voice became fainter, as if he was at a greater distance from the telephone.

Police officer Nathan Anderberg arrived at Rochelle's apartment at 4:51 a.m. The front door was open. He walked into the apartment. Defendant walked out from the hallway. Defendant said to Anderberg that "she shot herself." Defendant walked outside and Anderberg lost sight of him. Anderberg went into the bedroom and found Rochelle lying on the floor on her back. Rochelle had a gunshot wound in the center of her chest and died at the scene.

Police officer Eric South arrived at the apartment and was told to stand by defendant. Defendant was sitting in the back of a patrol car. He was visibly upset and asked if his girlfriend was okay. Defendant told South that he was in his car in the alley when he heard a loud pop. He was concerned, so he came inside to check on his girlfriend. He found that she had been shot. He thought he heard someone fleeing out the back window. He called 911. Defendant told South that people were out to get him, but he did not believe they would take it that far.

Defendant was transported to the police station. He was placed in a waiting room. He asked to use the bathroom, but his request was refused. He turned on the television and fell asleep. Detective Joseph Aldana arrived about 7 a.m. and asked defendant if he would go downstairs to be fingerprinted. Defendant asked if he could use the bathroom. He was told he could use the bathroom after they were done. Defendant cooperated until he was told they were going to do a gun residue test. He was taken back to the interview room.

After being instructed to sit down in the interview room, defendant sat down, unzipped his pants and stuck his hands into his pants. He was told to remove his hands from his pants. He refused and Officer South pulled his hands from his pants. Defendant had urinated on his right hand. A gunshot residue test was then performed, but no residue was found.

Officers processed the apartment and interviewed neighbors. There was nothing disturbed in the house except that the window in T.'s room was partially opened and the vertical blinds were disturbed. The bathroom door appeared to have been kicked in and the bedroom door was off its hinges.

Defendant's keys, wallet, telephone charger, money, cigarettes, cigarette lighter, baseball hat, and jewelry were on top of the dresser in the bedroom where Rochelle was shot.

Officers found a green plate inside a dresser drawer. The drawer contained items belonging to Rochelle. There were baggies of rock cocaine on top of the plate. No pipes for smoking cocaine base were found in the apartment. Defendant's wallet contained $220, in $10 and $20 bills. It was Officer Freddie Cavillo's opinion that the cocaine base was possessed for sale. He testified that it is not uncommon for individuals who sell

4

drugs to have a firearm available to protect themselves.

Officers searched the apartment and surrounding areas for four hours looking for a firearm, but could find none. The white Cadillac driven by defendant and parked in the alley behind the apartment was searched. It contained a gun holster inside a cellular phone box. There was no gun inside the holster.

Rachel Earl Anderson was Rochelle's neighbor. He arrived home at 3 a.m. He took some pain killers and fell asleep. He woke up to the sound of tires screeching in the alley followed by the slamming of Rochelle's security door. He fell asleep and did not wake up again until police officers knocked on his door. When he was initially interviewed, Anderson said he did not hear anything.

Danielle Barthelme was a nearby neighbor of Rochelle for two weeks before Rochelle died. She knew defendant as a customer from a store where she worked. She had seen defendant at the store at about 2 a.m. that morning. She got off work about 3 a.m. At approximately 5 a.m., she heard a gunshot. Within one to two minutes defendant was pounding on the wall yelling that he needed help. Barthelme eventually went outside and defendant asked her to see if Rochelle was okay. Barthelme did not check on Rochelle and testified that defendant remained within her sight until after officers arrived.

When Barthelme was interviewed by police the morning of the offense, she told police she heard the gunshot 10 to 15 minutes before police arrived and defendant ran up and banged on her door two or three minutes after the gunshot. Barthelme also told officers that she did not go outside her apartment.

An autopsy was performed on Rochelle. She died from a single gunshot wound to her chest. The wound was not a contact wound or a close wound. She had two abrasions to the left side of her face. She was six to eight weeks pregnant. She tested positive for marijuana but had no other drugs or alcohol in her system.

A bullet projectile was obtained during the autopsy. Criminalist Greg Laskowski testified that the gun that was used to shoot Rochelle was probably fired from several feet away. Her killing was inconsistent with suicide. The bullet that was removed during the autopsy was a .38. A variety of short-barreled .38 guns would fit in the holster removed from defendant's car.

In addition to evidence regarding the crime, the People were allowed to produce evidence of other acts of domestic violence perpetrated by defendant. Walter Wallace, a licensed private investigator, contacted Rochelle on June 23, 2005, to serve her with a subpoena to testify in a burglary trial. He knocked on the door and Rochelle answered. They talked and then defendant came up to the door and asked Wallace why he was there and why he was talking to Rochelle. Wallace told defendant why he was there and defendant responded that the "fucking bitch ain't going to court." Defendant then grabbed Rochelle by the hair and pulled her inside. Wallace told defendant to stop and asked Rochelle if he should call police. Rochelle said no, that defendant would calm down after Wallace was gone.

N. S.testified that she has known defendant for five years and has dated him. He moved in with her for a few months. He was very controlling and monitored everything she did. He threatened to kill her if she left him. He threatened to blow up her grandmother's house if she left him. On one occasion, defendant was angry because his friend had come over and N. had let him use the telephone when defendant was not home. Defendant came home, stripped N., shoved his finger up her vagina, poured cold water on her, and threatened to pour hot oil on her. In addition, he held a knife to her throat, threw

5

things at her, hit her in the face, and pushed her. She was able to escape because her cousin came over. On another occasion, N. was at her cousin's house and defendant pounded on the door and tried to drag N. outside. She fought and he picked her up and took her outside. Police arrived but she would not say anything to the police.

L.P. had a romantic relationship with defendant and he is the father of her child. She had previously called police and told them that defendant had hit her. She testified at trial that defendant did not hit her, and she lied to police when she told them that he had hit her. She also testified that during an argument with defendant she jumped from the second floor balcony only because she did not want to talk to him anymore, not because she was afraid of him.

K.W. is the mother of three of defendant's children. Her last baby, fathered by defendant, was conceived in June or July of 2005. She knew defendant had another girlfriend at the time. She testified that defendant never hit her or threatened her and she had never seen him with a gun. Her report to police that defendant had threatened her with a gun was not true and she made the report out of anger.

Michael Musacco testified as an expert on the effects of intimate partner battering.[FN2] He testified that it is common for women who have been battered to not report incidents because the report enrages the perpetrator. In addition, many battered partners report incidents and then recant their reports later.

    FN2. Intimate partner battering is now the preferred term used in what was formerly called battered women's syndrome.

(See Lodged Doc. No. 7.)

## DISCUSSION

I.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises out of Kern County Superior Court, which is located within the jurisdiction this Court.  28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lockyer v. Andrade,  538 U.S. 63, 70 (2003); Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), cert. denied, 522 U.S. 1008 (1997), quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), cert.

*denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320

(1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant

petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

II.    Standard of Review

   Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is

barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Harrington v. Richter, __ U.S. __, __, 131 S.Ct 770, 784, 178 L.Ed.2d 624

(2011); Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

   As a threshold matter, this Court must "first decide what constitutes 'clearly established

Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,

*quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this

Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as

of the time of the relevant state-court decision." Williams, 592 U.S. at 412. "In other words,

'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles

set forth by the Supreme Court at the time the state court renders its decision." Id.  In addition,

the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal

principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in

. . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of

review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir.2009), *quoting* Wright v. Van

Patten, 552 U.S. 120, 125 (2008); see Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v.

Musladin, 549 U.S. 70 (2006).  If no clearly established Federal law exists, the inquiry is at an

end and the Court must defer to the state court's decision. Carey, 549 U.S. 70; Wright, 552 U.S.

at 126; Moses, 555 F.3d at 760.

   If the Court determines there is governing clearly established Federal law, the Court must

then consider whether the state court's decision was "contrary to, or involved an unreasonable application of," [the] clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-13; see also Lockyer, 538 U.S. at 72. "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405, *quoting* Webster's Third New International Dictionary 495 (1976). "A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." Id. If the state court decision is "contrary to" clearly established Supreme Court precedent, the state decision is reviewed under the pre-AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir.2008) (en banc).

"Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411; see also Lockyer, 538 U.S. at 75-76. The writ may issue only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Harrington, 131 S.Ct. at 784. In other words, so long as fairminded jurists could disagree on the correctness of the state courts decision, the decision cannot be considered unreasonable. Id. If the Court determines that the state court decision is objectively unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious effect on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v.

8

1   Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the

2   states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a

3   state court decision is objectively unreasonable.  See LaJoie v. Thompson, 217 F.3d 663, 669 (9th

4   Cir.2000); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

5       AEDPA requires considerable deference to the state courts. "[R]eview under § 2254(d)(1)

6   is limited to the record that was before the state court that adjudicated the claim on the merits,"

7   and "evidence introduced in federal court has no bearing on 2254(d)(1) review." Cullen v.

8   Pinholster, __ U.S. __, __, 131 S.Ct. 1388, 1398-99 (2011).  "Factual determinations by state

9   courts are presumed correct absent clear and convincing evidence to the contrary." Miller-El v.

10  Cockrell, 537 U.S. 322, 340 (2003), citing 28 U.S.C. § 2254(e)(1).  However, a state court

11  factual finding is not entitled to deference if the relevant state court record is unavailable for the

12  federal court to review. Townsend v. Sain, 372 U.S. 293, 319 (1963), overruled by, Keeney v.

13  Tamayo-Reyes, 504 U.S. 1 (1992).

14  III.   Review of Claims

15      A.   Right to Confrontation - Forfeiture by Wrongdoing

16      In his first ground for relief, Petitioner claims the state court violated his Sixth and

17  Fourteenth Amendment rights to confrontation and due process by the application of the

18  forfeiture by wrongdoing doctrine with respect to the 9-1-1 calls made by the victim and victim's

19  neighbor prior to the crime.  In addition, Petitioner claims the appellate court erred under Giles v.

20  California, 554 U.S. 353 (2008), and Crawford v. Washington, 541 U.S. 36 (2004), by invoking

21  the forfeiture by wrongdoing doctrine when the trial court never cited the doctrine in admitting

22  hearsay evidence of the 9-1-1 calls by the victim and neighbor.

23      Petitioner presented this claim on direct appeal to the Fifth DCA where it was rejected in

24  a reasoned decision.  (See Lodged Doc. No. 7.)  Petitioner then presented the claim to the

25  California Supreme Court in a petition for review.  The petition was denied without comment on

26  September 12, 2007.  (See Lodged Doc. No. 11.)  When the California Supreme Court's opinion

27  is summary in nature, the Court must "look through" that decision to a court below that has

28  issued a reasoned opinion. Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3 (1991).  The Fifth

9

1  DCA analyzed the claim as follows:

2         Prior to trial, the People sought to admit tape recordings of five telephone calls to
   911. The People argued that the tapes were not hearsay, their admission would not violate
3  *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford* ), and they were spontaneous
   utterances as defined in Evidence Code section 1240.
4
5         Defendant filed papers in opposition to the People's motion and asked that the
   court exclude the use of any transcript of tape-recorded evidence because the transcripts
   were hearsay.
6
7         A hearing was held on the admission of the 911 tapes and transcripts. Defendant
   objected to a 911 tape of caller Lillian Martinez, Rochelle's neighbor, on hearsay grounds.
   The court ruled that the Martinez tape would be admitted as evidence. In addition,
8  defendant objected to the admission of transcripts of all of the calls, claiming they were
   not accurate. The court asked the parties to try to come up with a transcript that was
9  agreeable and if they could not agree the court would determine the correctness of any
   transcripts to be given to the jury. Defendant clarified that his objection to transcripts was
10 only to the transcript of the call by defendant to the 911 operator on July 11, 2005.

11        Numerous 911 tapes were admitted and played as evidence at trial, including three
   calls made by Rochelle prior to her murder and the Martinez tape. Defendant now claims
12 that the admission of these four 911 tapes violates the confrontation and due process
   clauses of the United States Constitution. In particular defendant argues that each of the
13 911 calls constituted testimonial hearsay and the statements were all made after the
   emergency situation had passed. Next, defendant argues that the improper use of
14 inadmissible hearsay at trial violates the constitutional guarantees of confrontation and
   due process.
15
16        The first tape was a call placed by Rochelle on May 15, 2005, when she reported
   that defendant had just broken her window out. She described defendant and the car he
17 was leaving in. At the end of the call, she said she did not have any money to fix the
   window.

18        The second tape was a call placed 12 minutes after the first call on May 15, 2005.
   Rochelle said she would like to cancel the previous call. Rochelle was asked by the
19 dispatcher if the matter had been resolved, and Rochelle responded that defendant was
   going to get the window fixed.
20
21        The next tape was a call placed on June 15, 2005 by Martinez. She requested that
   police respond to the scene where her neighbor (Rochelle) had been beaten up by her
   boyfriend; Rochelle had escaped the beating by climbing through Martinez's window. The
22 911 dispatcher asked Martinez if Rochelle needed an ambulance. Martinez said she
   thought Rochelle needed an ambulance because she was throwing up; but when Martinez
23 asked Rochelle if she needed an ambulance, she said no. The dispatcher asked who the
   assailant was and where he was located. The dispatcher requested that Martinez ask
24 Rochelle if defendant had any weapons. Rochelle could be heard crying in the
   background but she said defendant did not have any weapons. The dispatcher asked if
25 defendant had hit Rochelle. Martinez replied that he had.

26        The fourth 911 call admitted at trial was a call made by Rochelle on June 22,
   2005. Rochelle asked that an officer be sent out because she was having "man" problems and
27 wanted defendant out of her house. She said she was tired of going through this and was
   too young to be going through this. She gave defendant's name and a description of him.
28 She told the dispatcher that defendant was in her apartment and she was calling from the

neighbor's house. Rochelle said defendant got angry because she did not wash his clothes.

In *Crawford,* the United States Supreme Court held that the confrontation clause of the Sixth Amendment bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." (*Crawford, supra,* 541 U.S. at pp. 53-54.)

Two cases discussing the application of *Crawford* are determinative on the question of whether the 911 tapes now in question were properly admitted at trial. First, the three calls made by Rochelle to the 911 operator are admissible under the doctrine of forfeiture by wrongdoing. Under the equitable doctrine of forfeiture by wrongdoing, a defendant is foreclosed from objecting, on confrontation grounds, to the admission of out-of-court statements of a witness when the defendant has caused that witness to be unavailable. (*People v. Giles* (2007) 40 Cal.4th 833.) An intent to silence the witness is not necessary for the doctrine to apply. "[W]rongfully causing one's own inability to cross-examine is what lies at the core of the forfeiture rule." (*Id.* at p. 848.)

In order to apply the forfeiture-by-wrongdoing doctrine, certain things must be shown. "First, the witness should be genuinely unavailable to testify and the unavailability for cross-examination should be caused by the defendant's intentional criminal act. Second, a trial court cannot make a forfeiture finding based solely on the unavailable witness's unconfronted testimony; there must be independent corroborative evidence that supports the forfeiture finding." (*People v. Giles, supra,* 40 Cal.4th at p. 854.)

Here Rochelle is obviously unavailable to testify at trial because she is dead. The evidence, as outlined above in the statement of facts and considered without Rochelle's statements on the 911 tapes, is clearly sufficient to support a finding that defendant committed the homicide that caused Rochelle's unavailability.

Although this doctrine was not raised below, it is still applicable to this case. "If a judgment rests on admissible evidence it will not be reversed because the trial court admitted that evidence upon a different theory, a mistaken theory, or one not raised below." (*People v. Brown* (2004) 33 Cal.4th 892, 901.)

Based on these factors defendant's confrontation clause challenge to Rochelle's 911 calls has been forfeited.

As to the admissibility of Martinez's 9-1-1 call, the appellate court stated:

The 911 tape of the call made by Martinez was also admissible. First, statements made by Rochelle and heard in the background as Martinez spoke to the 911 operator are admissible under the forfeiture-by-wrongdoing doctrine. Second, the tape of the call made by Martinez is admissible because it is not testimonial.

"Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis v. Washington* (2006) 547 U.S. ----, ---- [126 S.Ct. 2266, 2273-2274].)

More recently, the California Supreme Court observed:

"We derive several basic principles from *Davis.* First, as noted above, the confrontation clause is concerned solely with hearsay statements that are testimonial, in that they are out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial. Second, though a statement need not be sworn under oath to be testimonial, it must have occurred under circumstances that imparted, to some degree, the formality and solemnity characteristic of testimony. Third, the statement must have been given and taken *primarily* for the *purpose* ascribed to testimony-to establish or prove some past fact for possible use in a criminal trial. Fourth, the primary purpose for which a statement was given and taken is to be determined 'objectively,' considering all the circumstances that might reasonably bear on the intent of the participants in the conversation. Fifth, sufficient formality and solemnity are present when, in a nonemergency situation, one responds to questioning by law enforcement officials, where deliberate falsehoods might be criminal offenses. Sixth, statements elicited by law enforcement officials are not testimonial if the primary purpose in giving and receiving them is to deal with a contemporaneous emergency, rather than to produce evidence about past events for possible use at a criminal trial." (*People v. Cage* (April 9, 2007, S127344) 40 Cal.4th 965 [2007 WL 1053284], fns. omitted.)

Defendant argues that Martinez's call to 911 was not an emergency because the assault had ended and Rochelle did not desire or require medical assistance. In *Davis* the 911 operator received a call that was terminated before anyone spoke. The operator reversed the call and spoke to the victim. She reported that the assailant was "jumpin' on me again." The 911 operator asked if the assailant had any weapons. The caller reported that he was using his fist. The operator asked for the assailant's name. The caller reported that the assailant was now running. The operator continued to ask questions and the victim described the context of the assault and gave more information about her assailant's identity. The United States Supreme Court held that the victim's call was not testimonial. It was a call for help against a bona fide physical threat. The nature of what was elicited was necessary to enable law enforcement to resolve the present emergency, rather than to simply learn what had happened in the past. The facts elicited to identify the defendant were to enable law enforcement officers to know the nature of the person they would be encountering. Furthermore, the answers given were not a tranquil response to questioning but were frantic answers in a situation that was not tranquil. The circumstances objectively indicated that the primary purpose of the questioning was to enable police assistance to meet an ongoing emergency. As such, the 911 call was admissible at trial.

We reject defendant's narrow interpretation of the call by Martinez. The call by Martinez was a call for help made as Rochelle had just climbed through Martinez's window, having been beaten up by defendant. It was a bona fide call for help. Rochelle could be heard throwing up in the background. Rochelle was crying at the time. The questions asked were in the nature of determining the type of emergency and the nature of the person law enforcement would be encountering. The call was not tranquil but was a frantic call for help.

The circumstances of the call made by Martinez objectively indicate that the primary purpose of the questioning was to enable police assistance to meet an ongoing emergency. As such, the call was not subject to the rule of *Crawford.*

Last, the appellate court determined that the 9-1-1 calls, even if they were inadmissible, were harmless:

Even if the admission of any or all of the calls was erroneous, any error was

12

harmless. T. and Eddington testified to numerous occasions when defendant would beat Rochelle. T. testified that Rochelle would run to Martinez's house when defendant hit her and would exit the apartment via T.'s window. T. testified to a particular incident when her mother jumped out of T.'s window after defendant hit her and T. followed Rochelle out the window. The 911 calls were merely cumulative to very strong evidence of the tumultuous relationship between defendant and Rochelle.

(See Lodged Doc. No. 7.)

The Confrontation Clause of the Sixth Amendment gives a defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. This right extends to defendants in state as well as federal criminal proceedings. Pointer v. Texas, 380 U.S. 400 (1965). In Crawford v. Washington, 541 U.S. 36, 53-54 (2004), the United States Supreme Court held that the Confrontation Clause of the Sixth Amendment bars the admission of out-of-court "testimonial" statements except when the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. There are exceptions to this bar, but "only those exceptions established at the time of the founding" are permissible. Id. at 54. The Supreme Court has acknowledged that there were two forms of testimonial statements at common law at the time of founding that were admitted even though they were unconfronted. One was the dying declaration, which is not at issue in this case. See King v. Woodcock, 1 Leach 500, 501-504, 168 Eng. Rep. 352, 353-54 (1789). The second common law doctrine is forfeiture by wrongdoing, which "permit[s] the introduction of statements of a witness who was 'detained' or 'kept away' by the 'means or procurement' of the defendant." Giles v. California, 554 U.S. 353, 359 (2008), citing Lord Morley's Case, 6 How.St.Tr. 769, 771 (H.L.1666).

In People v. Giles, 40 Cal.4th 833 (2007), the California Supreme Court determined that the forfeiture by wrongdoing exception encompassed those situations in which the alleged wrongdoing is the same as the offense for which defendant was on trial. The California Supreme Court held that the defendant forfeited his right to confront the witness where the defendant's criminal act caused the declarant's unavailability to testify even though the defendant did not specifically intend to prevent the declarant from testifying. Id. The California Supreme Court noted that numerous courts had similarly expanded the doctrine by eliminating the intent-to-prevent-testimony requirement. Id. at 845.

1    Subsequently, the United States Supreme Court in <u>Giles v. California</u>, 554 U.S. 253

2    (2008), reversed the California Supreme Court's decision. The Supreme Court held that

3    California's expanded exception was not "established at the time of the founding," <u>Crawford</u>,

4    541 U.S. at 54, and therefore not an exception to the right to confrontation.  <u>Giles v. California</u>,

5    554 U.S. at 377.

6    In this case, the three 9-1-1 calls made by the victim were challenged by Petitioner as

7    violating his right to confrontation.  Following the California Supreme Court's decision in

8    <u>People v. Giles</u>, the Fifth DCA determined that the victim's calls fit within the forfeiture by

9    wrongdoing exception since Petitioner had caused the victim's unavailability by murdering her.

10   Petitioner contends this was error in light of the Supreme Court's decision in <u>Giles v. California</u>.

11   Petitioner is correct that the forfeiture by wrongdoing exception utilized by the state court in his

12   case was overturned in <u>Giles v. California</u>.  However, as pointed out by Respondent, <u>Giles v.</u>

13   <u>California</u> was decided after direct review had concluded in his case.  Therefore, <u>Giles v.</u>

14   <u>California</u> was not the law at the time of the state court decision.  On federal habeas review, in

15   determining what is "clearly established Federal law," this Court must look to the holdings of the

16   Supreme Court "*as of the time of the relevant state-court decision*." <u>Williams</u>, 592 U.S. at 412

17   (emphasis added); <u>see also</u> <u>Beard v. Banks</u>, 542 U.S. 406, 413 (2004). Since <u>Giles v. California</u>

18   was decided after Petitioner's direct review became final, and <u>Giles v. California</u> was not made

19   retroactive to prior cases, Petitioner fails to demonstrate that the state court decision was contrary

20   to clearly established Supreme Court precedent.  Nor can Petitioner demonstrate that the state

21   court decision was an unreasonable application of Supreme Court precedent.  28 U.S.C.

22   § 2254(d)(1).  As pointed out by the California Supreme Court in <u>People v. Giles</u>, numerous

23   federal and state courts had extended the forfeiture by wrongdoing exception in such a manner.

24   <u>People v. Giles</u>, 40 Cal.4th at 845.  Indeed, three Justices dissented in <u>Giles v. California</u> which

25   demonstrates that the California determination cannot be considered an unreasonable application

26   of existing Supreme Court precedent. 28 U.S.C. § 2254(d)(1).

27   As to the 9-1-1 call made by Martinez, there is no dispute that her statements were non-

28   testimonial in nature, and "only *testimonial* statements are excluded by the Confrontation

Clause." <u>Giles</u>, 554 U.S. at 376 (emphasis in original).  Therefore, Petitioner's challenge on that basis must fail.

Furthermore, as Respondent correctly notes, the state court determined that even if the admission of the 9-1-1 calls violated Petitioner's due process and confrontation rights, the error was harmless.  The information contained in these calls was cumulative of much more damaging testimony elicited from the victim's daughter and cousin, both of whom testified that Petitioner had made repeated death threats and had repeatedly physically abused the victim.  Petitioner fails to demonstrate that the admission of the 9-1-1 calls had a substantial and injurious effect on the verdict.  <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993).  Therefore, the claim should be denied.

### B.   Failure to Litigate Forfeiture by Wrongdoing Exception at Trial

Petitioner next argues he was denied the effective assistance of counsel when the trial court was not provided an opportunity to rule on the forfeiture by wrongdoing exception respecting the 9-1-1 calls.  He also contends the appellate court ignored California Government Code § 68081 which requires litigants be given an opportunity to brief issues raised by the court and not the parties.

This claim was raised on collateral review in petitions for writ of habeas corpus to the Fifth DCA and California Supreme Court. (<u>See</u> Lodged Doc. Nos. 10, 18.)  The petitions were denied without comment.  In such a case "[w]here the state court's decision in unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."  <u>Harrington</u>, 131 S.Ct. at 784.

The law governing ineffective assistance of counsel claims is clearly established.  <u>Canales v. Roe</u>, 151 F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors.  <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984); <u>Lowry v. Lewis</u>, 21 F.3d 344, 346 (9th Cir. 1994).  First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. <u>Strickland</u>, 466 U.S. at 687.  Second, the petitioner must demonstrate prejudice,

that is, he must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result ... would have been different," 466 U.S. at 694.  A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. <u>Strickland</u>, 466 U.S. 668, 697 (1984).

In this case, Petitioner cannot demonstrate that he was deprived of the effective assistance of counsel.  As previously discussed, <u>Giles v. California</u> was not decided until after direct review became final.  There is no way the trial court could have predicted the Supreme Court decision.  There is also no way Petitioner's attorney could have foreseen the <u>Giles</u> decision, let alone provide argument at trial that California's exception would be overruled by the Supreme Court.  Therefore, Petitioner fails to demonstrate any error.  Furthermore, the Fifth DCA determined that the admission of the 9-1-1 tapes was cumulative to much more damaging testimony by the daughter and cousin.  Even if counsel's failure could be considered error, Petitioner did not suffer any prejudice.

As to Petitioner's argument that the appellate court failed to follow California Government Code § 68081, Petitioner's challenge involves a violation of state law, and generally,  federal habeas relief is unavailable for such violations. <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 68 (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'"); <u>Middleton v. Cupp</u>, 768 F.2d 1083, 1085 (9th Cir.), *cert. denied,* 478 U.S. 1021 (1985).  Unless a state procedural error rises to the level of "arbitrary or discriminatory action, [...] a mistake of state law does not constitute a due process violation; otherwise, 'every erroneous decision by a state court on state law would come as a federal constitutional question.'" <u>Kennick v. Superior Court of State of Cal.</u>, 736 F.2d 1277, 1280 (9th Cir.1984) (contention that remand of appellant to state custody when probation was previously terminated was based on a misinterpretation of state law did not rise to due process violation); <u>Miller v. Vasquez</u>, 868 F.2d 1116, 1118–19 (9th Cir.1989) (federal habeas relief is unavailable for alleged error in the interpretation or application of state law therefore review of sentence enhancement for assault with a deadly weapon is unavailable).  In order to obtain habeas relief for the incorrect application of state law, Petitioner must demonstrate that the state court's action was arbitrary,

discriminatory or fundamentally unfair such that Petitioner was denied due process under the

Fourteenth Amendment. <u>Kennick</u>, 736 F.2d at 1280.  He fails to do so.  He does not point to any

United States Supreme Court case in support of his contention that the Fifth DCA's failure to

follow California Government Code § 68081 rises to the level of a constitutional violation.

Moreover, as discussed above, any error could not have had a substantial and injurious effect on

the verdict.

### C.   Right to Confrontation - Forfeiture by Wrongdoing II

In his third ground for relief, Petitioner merely reargues his first claim.  For the same

reasons discussed in the Court's review of his first claim, the instant claim should be denied.

### D.   Denial of Petitioner's Motions to Change Attorney

Petitioner next argues the trial court's denials of his various motions to replace his trial

attorney violated his Fifth, Sixth, and Fourteenth Amendment rights.  He states he made four

<u>Marsden</u>[3] motions which demonstrate he had "completely lost trust" in his attorney.

This claim was presented on direct appeal to the Fifth DCA where it was rejected in a

reasoned decision.  (<u>See</u> Lodged Doc. No. 7.)  He then presented the claim to the California

Supreme Court in a petition for review, and the petition was denied without comment.  (<u>See</u>

Lodged Doc. No. 11.)  Therefore, the Court must "look through" the California Supreme Court

decision to the appellate court's decision.  <u>Ylst</u>, 501 U.S. at 804-05 & n. 3.

The Fifth DCA rejected the claim as follows:

> Defendant made three *Marsden* motions before trial. (*People v. Marsden* (1970) 2 Cal.3d 118.) After conducting lengthy hearings on each occasion, the trial court denied the motions. Defendant claims the court erred in denying his motions because the record demonstrates a breakdown in the attorney-client relationship that constitutes an irreconcilable conflict. In particular, defendant argues that his counsel withheld information from him, had to be prodded into making motions, and admitted to harboring personal animosity towards him. Based on these actions, defendant did not trust his counsel and even filed a formal complaint with the State Bar. Defendant contends that even though his counsel claimed he could represent defendant, the facts establish the existence of an irreconcilable conflict and the trial court erred when it refused to replace defendant's counsel. In addition, defendant contends the record establishes that he was not receiving the effective assistance of counsel and on that basis his counsel should have been discharged.

---

[3] <u>People v. Marsden</u>, 2 Cal.3d 118 (1970).

At the first *Marsden* hearing, on November 28, 2005, defendant complained that his attorney was not communicating with him, had not sent any subpoenas, had not given him any paperwork such as police reports, and had not filed a *Pitchess (Pitchess v. Superior Court* (1974) 11 Cal.3d 531) motion and a discovery motion. In addition, defendant claimed that he did not think his attorney believed in his innocence. Defendant expressed his dissatisfaction with his attorney's decision to not fight the domestic violence evidence sought to be presented against him. The court listened to all of defendant's complaints and questioned his counsel. Defendant's attorney said he had discussed the case with defendant, he had not yet given defendant all of the paperwork, his investigator had talked to witnesses suggested by defendant, and he found no reason to file a *Pitchess* motion. Based on discussions during the *Marsden* hearing, the attorney said he would now file a *Pitchess* motion. The attorney said he could continue to represent the defendant. The trial court denied the motion.

At the next hearing, on January 11, 2006, defendant said that he had been arrested without probable cause, he was illegally questioned, and there was not sufficient evidence presented at the preliminary hearing. Defendant argued that his attorney was nonchalant at the preliminary hearing, asked very few questions, did not contest the firearm enhancements, and at one point told him to be quiet.

The attorney said he did not file a motion to suppress because defendant's statements were voluntary. After further questioning of defendant by the court, defendant's attorney said he would file a suppression motion. Counsel said that there was definitely some personal animosity and some communication problems, but he did not think it would affect his representation of defendant, although it was "possible." After conferring with his supervisor, defendant's attorney said it would be no problem for him to represent defendant.

Defendant continued, saying his attorney had lied, acted like he was hiding things, failed to interview witnesses, and had not provided him with all of the reports. Defendant's attorney responded to each of these allegations. The attorney said his investigator had been successful at interviewing some witnesses and was attempting to contact others. He had not provided defendant with district attorney reports because they were consistent with the police reports that defendant had in his possession. The court told defendant's counsel to provide defendant with copies of all transcripts and reports. The court took a recess so counsel could provide all of the reports and transcripts to defendant. At the continued hearing, after defendant had been provided all of the reports and transcripts, the court asked if there was anything defendant wanted to add to his motion. Defendant said he had nothing to add because he was still going over the materials. The court denied the motion without prejudice.

The final *Marsden* motion was heard on April 4, 2006, shortly before trial was to commence. Defendant again contended that his counsel had not contacted all of the witnesses, his counsel did not believe in his innocence, his counsel was not trying to keep out prior domestic violence incidents, and he did not trust his counsel. The court conducted a lengthy hearing and questioned counsel's investigator regarding each witness defendant wished to have called. The investigator detailed all contacts and attempts to contact the witnesses on defendant's witness list. Defense counsel stated that some of the witnesses would not be called because they would not be helpful. Defense counsel explained that defendant did not agree with his approach to the case. Defense counsel intended to try to exclude prior incidents of domestic violence but did not think he would be successful. Defense counsel also stated that he was attacking the evidence of whether defendant urinated on his hands (purportedly to get rid of gunshot residue) from an angle different from what defendant wanted, but was doing so for tactical reasons. Although defense counsel said that the two have become agitated with each other, counsel did not

1    feel that it would affect his representation of defendant. The court denied the motion.

2        Although defendant cites multiple federal circuit court cases to support his
     position, we find that California cases are more than sufficient to determine the issue and
3    we further note that we are not bound by federal circuit court opinions. (*People ex. rel.*
     *Renne v. Servantes* (2001) 86 Cal.App.4th 1081, 1090.)
4
5        "A defendant is entitled to have appointed counsel discharged upon a showing
     that counsel is not providing adequate representation or that counsel and defendant have
6    become embroiled in such an irreconcilable conflict that ineffective representation is
     likely to result." (*People v. Jones* (2003) 29 Cal.4th 1229, 1244-1245.) "After hearing
7    from the defendant, a trial court is within its discretion in denying the motion unless the
     defendant establishes substantial impairment of his right to counsel. [Citation.] On appeal
8    we review the denial for an abuse of discretion. [Citation.]" (*People v. Vera* (2004) 122
     Cal.App.4th 970, 979.)
9
         Defense counsel is not required to investigate all potential witnesses, and the trial
10   court is not required to accept a defendant's claim of inadequate investigation. (*People v.*
     *Vera, supra,* 122 Cal.App.4th at pp. 979-980.) The trial court engaged in detailed
11   questioning regarding counsel's investigation and found either that counsel had
     investigated or had a tactical reason not to investigate further. These conclusions are
12   supported by the record.

13       When defendant presented new evidence at the *Marsden* hearing that indicated
     that motions should possibly be filed, defense counsel responded and filed those motions
14   (*Pitchess* and suppression motions).

15       Defendant did not renew his complaint, after it was first rejected, that his counsel
     was not meeting with him enough. In any event, "the frequency of meetings is not a
16   reliable indicator of incompetence." (*People v. Vera, supra,* 122 Cal.App.4th at p. 980.)

17       Although defendant and counsel had tactical disagreements and did not always see
     eye to eye, "'the way in which one relates with his attorney[ ] does not sufficiently
18   establish incompetence.'" (*People v. Cole* (2004) 33 Cal.4th 1158, 1192.)

19       Over the course of the *Marsden* hearings, counsel responded to defendant's
     complaints and, except when counsel's determinations regarding tactical decisions
20   collided with defendant's opposing view of tactics, their conflicts were resolved. Counsel
     at all times indicated that he was able and prepared to defend defendant. "A defendant
21   may not effectively veto an appointment of counsel by claiming a lack of trust in, or
     inability to get along with, the appointed attorney." (*People v. Smith* (2003) 30 Cal.4th
22   581, 606.) Nor may a defendant "force the substitution of counsel by his own conduct that
     manufactures a conflict." (*People v. Smith* (1993) 6 Cal.4th 684, 696.)

23       "In sum, the record is clear that the trial court provided defendant with repeated
     opportunities to voice his concerns, and upon considering those concerns reasonably
24   found them to be insufficient to warrant relieving trial counsel. We therefore find no basis
     for concluding that the trial court ... abused its discretion in declining to substitute
25   counsel." (*People v. Hart* (1999) 20 Cal.4th 546, 604.)

26   (See Lodged Doc. No. 7.)

27       First, the Court finds that Petitioner's claim fails to present a cognizable ground for relief

28   on federal habeas review.  In essence, Petitioner challenges the trial court's application of <u>People</u>

v. Marsden, 2 Cal.3d 118 (1970), in addressing his several motions to relieve counsel.  The

interpretation and application of state laws are generally not cognizable on federal habeas. Estelle

v. McGuire, 502 U.S. 62, 67, (1991) ("We have stated many times that 'federal habeas corpus

relief does not lie for errors of state law.' "), *quoting* Lewis v. Jeffers, 497 U.S. 764, 780 (1990);

Gilmore v. Taylor, 508 U.S. 333, 348-49 (1993) (O'Connor, J., concurring) ("mere error of state

law, one that does not rise to the level of a constitutional violation, may not be corrected on

federal habeas"); Sawyer v. Smith, 497 U.S. 227, 239 (1990), *quoting,* Dugger v. Adams, 489

U.S. 401, 409 (1989) ("[T]he availability of a claim under state law does not of itself establish

that a claim was available under the United States Constitution").  In addition, federal courts are

bound by state court rulings on questions of state law. Oxborrow v. Eikenberry, 877 F.2d 1395,

1399 (9th Cir.), *cert. denied*, 493 U.S. 942 (1989).  The Ninth Circuit has stated that the denial of

a motion to substitute counsel implicates a defendant's Sixth Amendment right to counsel, Bland

v. California Dept. of Corr., 20 F.3d 1469, 1475 (9th Cir. 1994), and the Sixth Amendment

requires an inquiry into the grounds for a motion to remove defense counsel, Schell v. Witek, 218

F.3d 1017, 1025 (9th Cir. 2000) (en banc); however, there is no direct precedent from the

Supreme Court holding that a denial of a motion to relieve defense counsel can be

unconstitutional.  "[I]t is not an unreasonable application of clearly established Federal law for a

state court to decline to apply a specific legal rule that has not been squarely established by [the

Supreme] Court." Knowles, 129 S.Ct. 1411, 1413–14.  Therefore, Petitioner's allegation that the

trial court erred in denying his motion to remove counsel does not present a cognizable claim on

habeas review.

      To the extent Petitioner claims he was denied the effective assistance of counsel by the

trial court's decision, it is clear from the record that the state court ruling was not contrary to or

an unreasonable application of Supreme Court precedent.

      As previously discussed, the law governing ineffective assistance of counsel claims is

clearly established.  Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of

habeas corpus alleging ineffective assistance of counsel, the court must consider two factors.

Strickland v. Washington, 466 U.S. 668, 687 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir.

1    1994).  First, the petitioner must show that counsel's performance was deficient, requiring a

2    showing that counsel made errors so serious that he or she was not functioning as the "counsel"

3    guaranteed by the Sixth Amendment.  Strickland, 466 U.S. at 687.  The petitioner must show that

4    counsel's representation fell below an objective standard of reasonableness, and must identify

5    counsel's alleged acts or omissions that were not the result of reasonable professional judgment

6    considering the circumstances.  Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348

7    (9th Cir. 1995).  Petitioner must show that counsel's errors were so egregious as to deprive

8    defendant of a fair trial, one whose result is reliable.  Strickland, 466 U.S. at 688.  Judicial

9    scrutiny of counsel's performance is highly deferential.  A court indulges a strong presumption

10   that counsel's conduct falls within the wide range of reasonable professional assistance.

11   Strickland, 466 U.S. 668, 687 (1984); Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

12       Second, the petitioner must demonstrate prejudice, that is, he must show that "there is a

13   reasonable probability that, but for counsel's unprofessional errors, the result ... would have been

14   different," 466 U.S. at 694.  A court need not determine whether counsel's performance was

15   deficient before examining the prejudice suffered by the petitioner as a result of the alleged

16   deficiencies.  Strickland, 466 U.S. 668, 697 (1984).  Since the defendant must affirmatively

17   prove prejudice, any deficiency that does not result in prejudice must necessarily fail.

18       In this case, the trial court considered Petitioner's multiple claims of ineffective

19   assistance and determined that defense counsel had not performed deficiently.  Petitioner stated

20   defense counsel had failed to interview several witnesses.  Defense counsel responded that most

21   of the witnesses in fact had been interviewed; however, a few would not be interviewed insofar

22   as he had a tactical reason not to do so.  Petitioner complained that defense counsel failed to

23   make certain motions.  When asked by the trial court about those motions, defense counsel

24   responded that in light of the new evidence presented by Petitioner at the hearing, he would file

25   the appropriate motions and did.  Petitioner also complained that he and defense counsel had

26   become embroiled in an irreconcilable conflict.  Counsel responded that this was not the case,

27   that there may be some animosity, but that he had no issue with continuing to represent Petitioner

28   in the case.  He stated there was no reason why he could not effectively continue to represent

Petitioner.  Much of Petitioner's complaints stemmed from Petitioner's disagreement over the tactical decisions of defense counsel and the approach counsel intended to take in presenting a defense.  This is not incompetence.

Petitioner also argued that counsel failed to meet with him regularly and failed to keep him apprised of the state of the evidence.  Nevertheless, Petitioner fails to state how this prejudiced him in any way.  Petitioner admitted that counsel had met with him on several occasions and discussed the case.  Petitioner does not state what additional meetings with counsel would have accomplished.

Ultimately the trial court provided Petitioner with several opportunities to voice his concerns.  The concerns were addressed and the trial court determined that Petitioner had failed to present sufficient evidence to warrant relieving counsel.  The Constitution does not "guarantee a meaningful relationship between a defendant and his counsel."  Morris v. Slappy, 461 U.S. 1, 13-14 (1983).  There was no evidence of a complete collapse in the relationship.  There was also no evidence of a conflict of interest.

Petitioner fails to show counsel was ineffective, or that the alleged ineffectiveness prejudice him in any way.  In light of the record, Petitioner fails to demonstrate that the appellate court's rejection of his claim of ineffective assistance of counsel was contrary to or an unreasonable application of the Strickland standard.  The claim should be rejected.

E.   Claims Five and Six

These claims are merely subparts of the same argument presented in Claim Four above. For the same reasons, they should be denied.

F.   Failure to Read Miranda Rights

In his seventh claim for relief, Petitioner alleges police never read him his Miranda[4] rights before questioning him about the murder.  He contends his constitutional rights were violated when his pre-Miranda statements were introduced at trial.

This claim was raised in petitions for writ of habeas corpus to the Kern County Superior

---

[4]Miranda v. Arizona, 384 U.S. 436 (1966).

Court, Fifth DCA, and California Supreme Court. The Fifth DCA and California Supreme Court denied the petitions without comment. Therefore, the Court "looks through" to the last reasoned decision which was from the Kern County Superior Court. Ylst, 501 U.S. at 804-05 & n. 3. The Kern County Superior Court addressed the claim as follows:

> Petitioner contends that his counsel failed to file a motion to suppress evidence. The documents petitioner supplies shows that his counsel filed a motion to suppress evidence under Penal Code section 1538. The ground for doing so was that any evidence gathered due to the illegal detention of petitioner without probable cause was the fruit of the poisonous tree, and thus inadmissible. This evidence includes statements he allegedly made prior to his arrest.

> The court found that the detention was proper at the very earliest when the officers found that petitioner was on parole for spousal abuse. Petitioner went down to the police station voluntarily. Most importantly, the act of urinating on his hands is an action not a statement, and thus not protected under the Fifth Amendment privilege against self-incrimination.

> For the sake of discussion, even if he should have received a *Miranda* recitation when he initially entered into the patrol car, there is no evidence he made any incriminating statements. The only three statements attributable to him were: A. Rochelle shot herself; B. An intruder came in through the window; C. I am not doing (expletive) until I speak with an attorney. The latter statement was admitted into evidence as an explanation as to why he would not undergo tests for the presence of gunshot residue. It was also admitted to counterbalance evidence of petitioner urinating on his hands.

(See Lodged Doc. No. 14.)

In Miranda v. Arizona, 384 U.S. 436, 444 (1966), the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." As to the procedural safeguards to be employed, "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Id. As to custodial interrogation, the Supreme Court meant "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. The test to determine whether the conduct constituted custodial interrogation is an objective one. Yarborough v. Alvarado, 541 U.S. 652, 667 (2004); Stansbury v. California, 511 U.S. 318 (1994). The more a setting resembles a traditional arrest, in other

1   words, the more constrained a defendant feels, the more likely the setting will constitute custody.

2   See Berkemer v. McCarty, 468 U.S. 420, 441 (1984). If detention is voluntary, it cannot

3   constitute custody. Id. On the other, detention that is long in duration and involuntary will

4   constitute custody. See, e.g., Mathas v. United States, 391 U.S. 1 (1968).

5        In this case, the state court did not violate Miranda.  First, Petitioner was not interrogated.

6   His statements were entirely spontaneous and unsolicited.  (CT 262-263.) Second, Petitioner was

7   not "in custody" such that Miranda warnings were required.  He was not considered a suspect

8   initially, but the reporting party.  (CT 260.)  He was not initially placed into custody, arrested, or

9   handcuffed.  He was asked to sit in a patrol car in order to separate him from investigative

10  personnel and other people who were coming and going from the crime scene.  (CT 256-257.)

11  While he sat in the back seat of the patrol car, the door was left open and Petitioner talked on his

12  cell phone.  (CT 257.)  He was not questioned.  He voluntarily agreed to go to the police station

13  to provide a witness statement.  (CT 263-264.)  At the police station, he was led to a lobby

14  waiting room containing couches, chairs and televisions.  (CT 264. 266.)  Petitioner was allowed

15  to watch television, eat, drink or sleep.  (CT 264.)  At one point, an investigating officer

16  approached Petitioner and asked if he'd be willing to be photographed and fingerprinted;

17  Petitioner agreed and asked if he could use the restroom.  (CT 267.)  He was informed he was

18  more than welcome to once they had concluded. (CT 267.)  He was then told the officers

19  intended to conduct a gunshot residue test. (CT 267.) Petitioner refused and asked to speak to a

20  lawyer. (CT 268.)  Petitioner was led to another room, where he proceeded to stick his hands

21  down his pants and urinate on his hands in an attempt to rid himself of gunshot residue.  (CT

22  268-269.)  He was placed into custody at that time. (CT 269.)  Given that Petitioner was not

23  interrogated, he was not "in custody," and his statements were volunteered, it is clear his Miranda

24  rights were not violated.

25       Under these circumstances, this Court does not find the state court decision to be contrary

26  to, or an unreasonable application of, established Supreme Court precedent as set forth in

27  Miranda and its progeny.  The claim should be denied.

28       G.   Imposition of Upper Term

Petitioner next alleges the trial court imposed upper terms for the gun use enhancement, the arming allegation for the drug conviction, and the drug conviction without a jury finding in violation of his Sixth Amendment right to a jury trial pursuant to Cunningham v. California, 549 U.S. 270 (2007).

This claim was raised on direct review before the Fifth DCA where it was denied in a reasoned decision.  Petitioner then presented the claim in his petition for review to the California Supreme Court, where it was denied without comment.  This Court reviews the decision of the Fifth DCA as the last reasoned decision.  The Fifth DCA denied the claim as follows:

> At sentencing the trial court imposed the upper term for the gun use enhancement linked to the murder, the arming allegation for the drug conviction, and the drug conviction. In addition, the court ordered that the drug conviction run consecutive to the sentence for the murder.

> The trial court's statement of reasons was as follows: "The Court finds that there are no circumstances in mitigation.

> "In aggravation, the defendant has engaged in violent conduct, which indicates a serious danger to society, as demonstrated by his numerous prior convictions for Penal Code Section 273.5 violations.

> "The defendant's prior convictions as an adult and sustained petitions in juvenile delinquency proceedings are numerous.

> "The defendant was on parole when the crime was committed. And the defendant's prior performance on juvenile probation, misdemeanor probation, felony probation, and parole was unsatisfactory, in that he violated terms and continued to reoffend.

> "..................................................................

> "The in the light of the fact there are no circumstances in mitigation, only those in aggravation.

> "Consecutive sentencing as to Count 2 is justified because the crimes and their objectives were predominantly independent of each other."

> In *Cunningham v. California* (2007) 549 U.S. ---- [127 S.Ct. 856] the United States Supreme Court held that Cunningham's right to trial by jury was denied under California's determinate sentencing law (DSL) because the judge, not the jury, found the facts that resulted in an upper term sentence. Petitioner Cunningham was convicted of continuous sexual abuse of a child. Under California's DSL, Cunningham could be sentenced to the lower term of six years, the mid term of 12 years, or the upper term of 16 years. In order to receive the upper term the judge had to find one or more facts in aggravation. The trial judge found six aggravating factors, including victim vulnerability and that Cunningham was a serious danger to the community based on his violent conduct. Cunningham's lack of a prior record was found as the sole factor in mitigation. The trial court found that the aggravating factors outweighed the one mitigating factor

and sentenced Cunningham to the upper term. The appellate court upheld his sentence. The California Supreme Court denied Cunningham's petition for review, having recently decided in *People v. Black* (2005) 35 Cal.4th 1238 (*Black*) "that the judicial factfinding that occurs when a judge exercises discretion to impose an upper term sentence ... under California law does not implicate a defendant's Sixth Amendment right to a jury trial." (*Id.* at p. 1244.)

The United States Supreme Court granted review and disagreed with the California Supreme Court's decision in *Black*. "[T]he Federal Constitution's jury-trial guarantee proscribes a sentencing scheme that allows a judge to impose a sentence above the statutory maximum based on a fact, other than a prior conviction, not found by a jury or admitted by the defendant." (*Cunningham v. California, supra,* 549 U.S. at p. ---- [127 S.Ct. at p. 860].)

Defendant claims the denial of a jury trial on all of the aggravating sentencing factors was a violation of his right to a jury trial and that these sentences must be reduced to the middle term. In addition, he argues that *Cunningham* applies to the imposition of consecutive sentences, and thus the trial court erred in imposing a consecutive sentence on facts not found by a jury beyond a reasonable doubt.

We begin by finding that *Cunningham* does not apply to the imposition of consecutive sentences. In doing so we agree with the analysis in *People v. Hernandez* (2007) 147 Cal.App.4th 1266. *Cunningham* did not address consecutive sentences and did not expressly overrule this portion of *People v. Black, supra,* 35 Cal.4th at page 1262 which held that consecutive sentencing decisions are not affected by the United States Supreme Court decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 and *Blakely v. Washington* (2004) 542 U.S. 296.

In addition, unlike the statutory presumption in favor of a middle term, there is no statutory presumption in favor of concurrent rather than consecutive sentences. (*People v. Reeder* (1984) 152 Cal.App.3d 900, 923.) The trial court has an affirmative duty to determine if concurrent or consecutive sentences will be imposed for multiple offenses. (Pen.Code, § 669.) The provision in Penal Code section 669 that imposes concurrent rather than consecutive sentences if the trial court fails to perform its affirmative duty of choosing is a policy of "speedy dispatch and certainty." (*In re Calhoun* (1976) 17 Cal.3d 75, 82.)

Although the trial court is required to state reasons for its decision to impose consecutive sentences, this requirement does not create a presumption or an entitlement to a particular result. (See *In re Podesto* (1976) 15 Cal.3d 921, 937.) "[E]very person who commits multiple crimes knows he or she is risking consecutive sentencing. While such a person has the right to the exercise of the court's discretion, the person does not have a legal right to concurrent sentencing." (*People v. Hernandez, supra,* 147 Cal.App.4th at p. 1271.) The *Cunningham* line of cases does not apply to consecutive sentences.

Next we turn to the question of whether the aggravated terms were properly imposed. The requirement in *Cunningham* that aggravating factors that are used to increase a sentence beyond the statutory maximum must be found by a jury beyond a reasonable doubt does not apply to the fact of a prior conviction. (*Almendarez-Torres v. United States* (1998) 523 U.S. 224; *Apprendi v. New Jersey, supra,* 530 U.S. at p. 488; *Blakely v. Washington, supra,* 542 U.S. at p. 301; *Cunningham v. California, supra,* 549 U.S. ---- [127 S.Ct. at p. 868.] )

Relying on Justice Thomas's concurring opinion in *Apprendi,* calling into question *Almendarez-Torres,* defendant argues that all aggravating factors, including prior

26

convictions, should be tried to a jury and found beyond a reasonable doubt. The *Apprendi* majority did not overrule *Almendarez-Torres.* We decline defendant's invitation to follow the analysis contained in a concurring opinion.

We find that two of the factors relied upon by the trial court in imposing aggravated terms fall within the prior conviction exception to the *Apprendi* rule. The trial court found that "defendant's prior convictions as an adult and sustained petitions in juvenile delinquency proceedings are numerous." This finding was supported by the record. Defendant had two juvenile adjudications in 1995 when he was 17 years old; one for petty theft and one for driving without a license. Defendant's prior convictions included four separate convictions for the willful infliction of corporal injury (Pen.Code, § 273.5) occurring on three separate occasions in 1996 and 1997. Defendant was also convicted of numerous (nine) Vehicle Code violations, including driving under the influence, driving with a suspended or revoked license, driving while in possession of marijuana, and fleeing the scene of a vehicle accident involving injuries.

The second valid aggravating factor that falls within the prior conviction exception to *Apprendi* is that the defendant was on parole at the time he committed the current offense. The fact that defendant was on parole at the time he committed the current offense can be determined by a review of the court record relating to the prior offense.

Even if we were to take a narrow view of *Apprendi* and find that prior juvenile adjudications cannot be utilized (because juvenile adjudications do not involve a jury trial), that a finding of numerous prior convictions is subjective, and that being on parole encompasses more than just the fact of a prior conviction, we do not find reversible error in failing to submit these factors to a jury.

The failure to submit a sentencing factor to a jury is not structural error requiring reversal per se, but is subject to a harmless beyond a reasonable doubt error analysis under *Chapman v. California* (1967) 386 U.S. 18. (*Washington v. Recuenco* (2006) 548 U.S. ---- [126 S.Ct. 2546].) The failure to submit a sentencing fact to a jury is analogous to the failure to instruct on an element of an offense or to otherwise remove an element of an offense from the jury's consideration. "[A] court ... asks whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element [sentencing fact]. If the answer to that question is 'no,' holding the error harmless does not 'reflec[t] a denigration of the constitutional rights involved.' [Citation.]" (*Neder v. United States* (1999) 527 U.S. 1, 19.)

The record does not contain evidence that absent the juvenile adjudications a finding of numerous prior convictions would not have been found. Also, there is nothing in the record, nor is there anything suggested by defendant, that would lead to a contrary finding with respect to the factor that defendant was on parole at the time the crime was committed. In addition, we find that there is nothing in the record that could rationally lead to a contrary finding on the fact that defendant's prior performance on probation or parole was unsatisfactory. Defendant violated probation and/or parole at least 14 separate times over the course of many years. These are objectively verifiable facts.

We find that the aggravating factor that "defendant has engaged in violent conduct, which indicates a serious danger to society, as demonstrated by his numerous prior convictions for Penal Code Section 273.5 [willful infliction of corporal injury] violations" could not properly be used by the trial court. First, this factor overlaps with the factor that defendant has numerous prior convictions as an adult and, second, it requires subjective findings that are not self-evident from the record before the court.

Thus, three of the four factors used by the trial court in imposing the aggravated terms are valid considerations in determining if defendant should receive the upper term. Any error in utilizing one invalid factor was harmless under either a *Watson (People v. Watson* (1956) 46 Cal.2d 818, 836) or a *Chapman (Chapman v. California supra,* 386 U.S. 18) standard. The trial court would not have chosen a lesser sentence had it known that one of its reasons was improper. (See *People v. Price* (1991) 1 Cal.4th 324, 492.)

(See Lodged Doc. No. 7.)

In Apprendi v. New Jersey, the Supreme Court held that "'any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.'" 530 U.S. 466, 476 (2000), *quoting* Jones v. United States, 526 U.S. 227, 243 n. 6 (1999).  This holding, including the exception for a defendant's criminal history, has been upheld by the Supreme Court in several subsequent cases. See James v. United States, 550 U.S. 192, 214 n.8 (2007); Cunningham v. California, 549 U.S. 270, 274-75 (2007); United States v. Booker, 543 U.S. 220, 230-31 (2005); Blakely v. Washington, 542 U.S. 296, 301 (2004). In Cunningham, the case relied on by Petitioner, the Supreme Court held that the middle term in California's sentencing scheme is the statutory maximum. 549 U.S. at 288. Nevertheless, the criminal history exception was retained. Id. at 275 ("[T]he Federal Constitution's jury-trial guarantee proscribes a sentencing scheme that allows a judge to impose a sentence above the statutory maximum based on a fact, *other than a prior conviction*, not found by a jury or admitted by the defendant.") (emphasis added).

Petitioner contends that the trial court's reliance on his numerous prior convictions and violation of parole in selecting the upper term violates Cunningham.  His arguments are without merit.  As noted above, Cunningham and Apprendi specifically allow for the imposition of the upper term based on judge's finding of a prior conviction.  As to the violation of parole, the state court reasonably determined that the prior conviction exception applies.  As the Ninth Circuit acknowledged in Kessee v. Mendoza-Powers, 574 F.3d 675 (2009), regardless of whether reliance on this factor comports with the Ninth Circuit's view of the prior conviction exception, the state court's interpretation does not contravene AEDPA standards because the Supreme Court has not given explicit direction and because the state court's interpretation is consistent with many other courts' interpretations.  28 U.S.C. § 2254(d).  Therefore, the claim should be denied.

1

H.   Insufficiency of Evidence

2        In his last claim for relief, Petitioner alleges there was insufficient evidence to convict.

3   He states that there was no evidence of culpability, that no murder weapon was found, that no

4   fingerprint or DNA evidence implicating him was discovered, that there were no eyewitnesses,

5   that no gunshot residue was discovered on Petitioner's person, and that all evidence pointed to an

6   intruder having been the perpetrator.

7        This claim was raised on collateral review in petitions for writ of habeas corpus to the

8   Fifth DCA and California Supreme Court. (See Lodged Doc. Nos. 10, 18.)  The petitions were

9   denied without comment.  In such a case "[w]here the state court's decision in unaccompanied by

10  an explanation, the habeas petitioner's burden still must be met by showing there was no

11  reasonable basis for the state court to deny relief."  Harrington, 131 S.Ct. at 784.

12       The law on insufficiency of the evidence claim is clearly established.  The United States

13  Supreme Court has held that when reviewing an insufficiency of the evidence claim, a court must

14  determine whether, viewing the evidence and the inferences to be drawn from it in the light most

15  favorable to the prosecution, any rational trier of fact could find the essential elements of the

16  crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  Sufficiency

17  claims are judged by the elements defined by state law.  Id. at 324 n.16.  On federal habeas

18  review, AEDPA requires an additional layer of deference to the state decision.  Juan H. v. Allen,

19  408 F.3d 1262, 1274 (9th Cir.2005).  This Court must determine whether the state decision was

20  an unreasonable application of the Jackson standard.

21       Petitioner was convicted under § 187(a), defining murder as "the unlawful killing of a

22  human being, or a fetus, with malice aforethought."  Under California law, the elements required

23  for a finding of murder in the first degree include any "willful, deliberate, and premeditated

24  killing."  Cal. Penal Code § 189.  In this case, there was certainly more than sufficient evidence

25  to find Petitioner guilty of murder.  The victim's daughter and cousin testified that Petitioner

26  argued with the victim and beat her on numerous occasions.  On other occasions, he would

27  threaten to kill her and would point a gun at her.  The gun was a .38-caliber handgun.  The victim

28  was killed by a round fired from a .38.  Although a gun was never found at the scene, officers

1  discovered a holster in Petitioner's vehicle.  The holster fit a variety of .38-caliber hanguns.

2  On the night of the murder at 3:42 a.m. and again at 4:14 a.m., surveillance cameras

3  spotted Petitioner's vehicles coming and going in the alley behind the apartment.  No other

4  vehicles or foot traffic were detected.  Petitioner called 9-1-1 at 4:47 a.m. requesting an

5  ambulance.  A witness testified that she heard a gunshot 10 to 15 minutes before officers arrived.

6  She further testified that 2 to 3 minutes after the gunshot, Petitioner ran up and banged on her

7  door several times.  When officers arrived at 4:51 a.m., Petitioner emerged from the apartment

8  and told officers the victim had shot herself.  However, the autopsy revealed the gun had been

9  fired from a distance.  Later, Petitioner changed his story and stated an intruder had killed the

10  victim.  Petitioner's keys, wallet, money, and jewelry were on the dresser in the bedroom where

11  the victim was shot.

12  Petitioner was transported to the police station to provide a statement.  Initially, he

13  voluntarily cooperated.  However, when officers informed Petitioner they intended to perform a

14  gunshot residue test on him, Petitioner placed his hands in his pants and urinated on his fingers,

15  presumably in an attempt to rid himself of any residue.

16  In his traverse, Petitioner complains that there was no evidence of premeditation or

17  deliberation.  Viewing the evidence and the inferences to be drawn from it in the light most

18  favorable to the prosecution, the issue is whether *any* rational trier of fact could have found that

19  the elements of premeditation and deliberation were present beyond a reasonable doubt in

20  Petitioner's case.  Jackson, 443 U.S. at 319.  In this case, there was certainly evidence that the

21  killing was deliberate and premeditated.  The victim was killed by a single shot from a distance.

22  There was evidence of motive.  See People v. Anderson, 70 Cal.2d 15, 27 (1968) (Motive is one

23  of the common indicators that a killing was deliberate and premeditated).  Petitioner admits in

24  his traverse that he "needed" the victim.  (See Pet'r's Traverse at 20.)  He states she would cook,

25  clean, iron and wash his car for him.  He admits she bought a car for him and would give him

26  money.  The record reveals that two days prior to the murder, the victim demanded that Petitioner

27  move out of the residence.  In addition, there was evidence that Petitioner maintained several

28  other relationships with women.  There was also evidence that the victim was pregnant with

1  Petitioner's child and Petitioner had demanded that the victim terminate the pregnancy.

2  Moreover, there was substantial evidence that Petitioner had threatened to kill the victim on prior

3  occasions, to the point where Petitioner would point his gun at the victim while threatening her.

4  Based on the evidence presented in this case, it is clear that the evidence presented was sufficient

5  for a rational trier of fact to conclude that Petitioner committed the crime of murder with

6  premeditation and deliberation.

7      There was also substantial evidence from witnesses that Petitioner conducted drug sales

8  in the apartment.  In addition to the witness testimony, several baggies of rock cocaine were

9  discovered in a dresser drawer consistent with witness accounts.

10      Given the entire record, Petitioner fails to demonstrate that the state court unreasonably

11  applied <u>Jackson</u> in denying his claim.  The ground should be rejected. 28 U.S.C. § 2254(d).

12  **RECOMMENDATION**

13      Accordingly, the Court HEREBY RECOMMENDS that this action be DENIED WITH

14  PREJUDICE.

15      This Findings and Recommendation is submitted to the Honorable Lawrence J. O'Neill,

16  United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and

17  Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of

18  California.  Within thirty (30) days after service of the Findings and Recommendation, any party

19  may file written objections with the court and serve a copy on all parties.  Such a document

20  should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies

21  to the objections shall be served and filed within fourteen (14) days after service of the

22  objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C.

23  § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time

24  may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th

25  Cir. 1991).

26

27      IT IS SO ORDERED.

28  **Dated:**   **October 24, 2011**          **/s/ Gary S. Austin**

UNITED STATES MAGISTRATE JUDGE